The next case is Bea v. Commissioner Internal Revenue Mr. Mancino is here for Bea and Ms. Wong is here for the Commissioner. Mr. Mancino, you may begin when you are ready. So, may it please the Court, my name is Doug Mancino. Hold on just a second, let's let Ms. Wong get at Council table. I try to get every advantage over the government I can. May it please the Court, I'm Doug Mancino and I represent Mr. and Mrs. Bea in this appeal. This appeal involves a tax election and every tax election is a unilateral action on the part of the taxpayer and is motivated by obtaining a tax benefit. We contend that in this case neither of those facts are present in the case here. The issue in this case is the election itself is irrevocable and we don't contend that it is not. What we believe is the case here is that the taxpayers in this case never made a volitional decision to make the election in the first place. Their tax return preparer, whom they have relied on for 30 years or so, included an unnecessary election in a 180-plus page return that not even a tax professional could understand would be irrevocable. There's language on the return. They signed the return and they agreed that they had, quote, examined the return and the accompanying schedules and statements and that they are true, correct and complete, close quote. Yes. Let me just make sure I understand exactly what your position is. You are not challenging the irrevocable nature of the election under Section 172C. You're not challenging that. That's correct. You're not challenging the fact that they relied on their tax preparer who made that decision without their knowledge, period. That's correct. And basically the interesting thing about this case is the fact that making that election in 2014 was completely irrelevant. There was no tax benefit to be obtained, unlike when that provision was added to the code in 1976. Going back, though, to what Judge Vinson just said, isn't, doesn't this just boil down to a malpractice action against the accountant? I think that's, whether malpractice exists depends on the outcome of this appeal, in our opinion. In other words, we think that we should determine whether a volitional act was made by the taxpayer in 2014, notwithstanding that they signed their return under penalty of perjury, and we don't disagree with that fact. But we have a situation here where almost, in 2016, when the taxpayers first learned of the effect of that election, they had no knowledge. I've been practicing for 44 years. There are over 50 irrevocable elections. What do we do with the language, though, on their tax return where they say, we've looked at it, we've examined it, and it's true, correct, and complete, and here's my signature, that the IRS is not entitled to rely upon that? We're going to place the burden of determining whether or not that's correct on the IRS, you know, whether or not they have a bad tax return prepared? I think it goes to the matter of reasonableness, Your Honor. The fact of the matter is, is that, you know, as I said, I've been doing this for 44-plus years. My return is 14 pages long, and I can attest that I can understand every aspect of that return. When you're dealing with a layperson dependent upon a tax return preparer, interpreting provisions of a multiple thousands of pages of Internal Revenue Code provisions, and language in the language provided by the government that deals with the specific tax election involved here, provides no indication of what the consequences of that election are, has no indication of revocability or irrevocability there. I think it's... You don't have an obligation as a taxpayer to review the return itself and satisfy yourself that it is accurate? There's no obligation on the part of a taxpayer to do that? Otherwise, a taxpayer can just insulate themselves from any liability whatsoever by relying on the tax return preparer. That's why you have that language on the tax return. I've examined it, and everything is true and correct. Period. Here's my signature. Actually, it's to the best of their ability. You're talking about a layperson looking at a complicated return where the tax advisor, the return preparer, herself acted incompetently. I think it's pretty remarkable, frankly, that as soon as this was discovered in 2016, that the return preparer was prepared to sign her own statement under penalty of perjury acknowledging that she made an error. There was absolutely no benefit to the bays in making that election in the first place, and they were uninformed. You're asking us to open the door to a constant, almost continuous challenge to every tax return that's shown to have an improper calculation of taxable income or deductions and everything. I have criminal cases all the time where the taxpayer signed the return prepared by somebody else, and they come into criminal court and say, well, I really wasn't aware of that. That's no defense, and it shouldn't be a defense. You're responsible, aren't you? Actually, Your Honor, I think that this is a case that's very limited in its scope. It really involves the formation of a judgment on a complicated matter that was made in reliance on the advice of an advisor. And in this case, the bays have made it clear that they had no knowledge of the consequences of the election. They were not informed of it. Their advisor, their return preparer, told them that in their own sworn affidavit. Well, we have a lot of evidence that the advisor gave a lot of bad advice and made some bad optional choices in the return, right? And there's 38 different errors in one return? Yeah, it's very interesting, Your Honor, that you bring that up, because if you look at the pattern of the return preparer prior to 2011 when the bays started getting into investments that were generating net operating losses, the incidence of error was very low. We specifically looked back to prior returns and found that it's a reasonable error rate. But beginning in 2011, 12, 13, and 14, the error rate jumped up markedly. And in some respects, I think it's kind of unreasonable to expect a layperson, even a sophisticated layperson, to have the breadth of knowledge that I don't have, having spent a career in this area, to understand every nuance of every aspect on a complicated return. Well, I've always— But certainly, before you sign something under penalty of perjury, if you don't understand, doesn't that create an obligation to at least ask the accountant, I don't understand this. Before I sign it, can you please explain it? I think you have to use a reasonable effort to understand it as best as you can to properly sign that declaration under penalty of perjury. I don't think in the 21st century, with the complexity of the Internal Revenue Code and the voluminous regulations that you have today, that any individual, myself included, can understand the consequences of every line item that one puts on a tax return. Well, perhaps we ought to ask all the members of Congress to do their own tax returns. We can't do that here. That would be a good idea, Your Honor, but I understand that's not likely to happen. What you're asking us to do today, aren't you asking us to, in looking at the statute, the text of 172b3, aren't you asking us to read out the fact that it says irrevocable? I'm not asking you to read out the fact that it's irrevocable. What I'm asking is to recognize the fact that the IRS and Treasury Department were tasked with the responsibility of providing guidance to the taxpayers after the 1976 Act was enacted concerning a wide range of elections that were included in the 76 Act, including 172b3. What the IRS and Treasury failed to do was to provide instructions and guidance to taxpayers that made it absolutely clear that an election, which at that time clearly had a tax motivation, whereas today it has none, was irrevocable. There's no language giving even a hint to the bays that the election, putting their return on their behalf by their return preparer, was irrevocable. And there would be no reason why anybody other than a sophisticated tax practitioner would have understood the consequences of it. And as we indicated in our brief, frankly, it was a dumb election in the first place because it was completely unnecessary. Are you suggesting that in 2018 there are zero taxpayers who would benefit from such an election? There would be very few. And the main reason for that, the whole reason for having the irrevocable election as a choice, as they said in the 76 legislative history, was that if you gave up the right to carry back for two years, you had two additional years tacked on to the five-year carry-forward period that was in place at the time. In the years under examination here, the carry-forward period is 20 years. So no one, you know, the present value of a lost carry-forward over 20 years is probably zero in today's dollars. So there's really no benefit. And the mechanics of the way the net operating loss carry-back and carry-forward work, basically, to the extent the carry-back is unused, it carries forward for another 20 years past the year under examination. So there really is no tax benefit to be derived from it. And that's why— Well, actually there is. I mean, chances are you're going to have taxable income in some of the future years. That's presumed. You're not going to have an operating loss every year. So you'll be able to use it in year one, year two, year three, eventually going to 20 years if you need to. So there's a benefit, right? Well, Your Honor, there is, except in this case there's a windfall to the government in the form of the alternative minimum tax. As we indicated in our brief, taxpayers were hit in 2012 with a substantially greater AMT liability than would have been the case had the loss been carried back. And I forget off the top of my head, but it's something like a quarter-million-dollar difference. And that doesn't get recouped in any carry-forward period. It is an absolute windfall to the government. So with that, over my time, I'll— Thank you, Mr. Mancino. You've reserved some time for rebuttal. We'll hear from Ms. Wong. Thank you. Good morning, Your Honors. Cheryl Wong for the Commissioner. I would start by bringing this Court's attention to the Robarts case. That was a tax court decision that was affirmed by this Court. In that case, the taxpayer also made an election, a different election, and she wanted to revoke it 10 years later, saying that—making the exact same argument that Mr. and Mrs. Bay are making today. And the tax court rejected that argument, saying that, well, even if you didn't know about the election that your accountant made for you, that is not a reason for revoking the election. And even if that election that you didn't know about turned out not to have been a good idea, that simply represented advice that did not work out well. Let me ask, how many years back can you file an amended tax return? I actually did not know off the top of my head. But you can. Yes. If you need to, you can file an amended return for at least two or three years back, right? Yes. And why can't you then, if you file an amended return, include within that amended return an amended election under Section 172? Are you referring to a situation where the taxpayer included the election in the original return and then tried to revoke it in the amended return? Yes. Because the statute clearly says that it is irrevocable. So in that instance, if a taxpayer tried to do that, in effect, that would be revoking the election, trying to find a loophole around the clear language of the statute. It's all part of the filed return. So if you can file an amended return, why can't you file an amended Section 172 election? Well, because also in that provision, there is also a time limit requirement. You have to file a 172b3 election by the due date of the return. Now, I don't think the statute specifically says by the due date of the original return. But I, and I can't recall the name of the case, but I think there is at least one case that interpreted it to mean the due date of the original return. And it would make sense to interpret it that way because that forces the taxpayer to make a decision at that point under the facts of that date as he or she knew it. What about the argument that has been raised that this statute, this election, benefits very few, if any, taxpayers? That it had a benefit back in the 70s, but that there's no present benefit to a taxpayer making this election. Well, I'm not sure that that's relevant. Back then, whether something had a benefit or not, it depends on the individual situation of the taxpayer. The taxpayer has to crunch their own numbers, essentially. And I can't, and I think an argument that says, well, this benefits very few taxpayers is really too broad an argument to make without crunching the numbers. And I wanted to point out, Ms. Mancino, I think, mentioned some kind of tacking provision. We pointed out in our brief that tacking provision, which was discussed in the Senate committee report, actually never made it past conference and never made it into the actual statute itself from 1976 through as many iterations until now. So I'm not sure that that's relevant. Well, I guess it would be relevant if it would certainly bolster the argument that they had no reason to make this election, that this was not, in fact, a knowing or intelligent election. They had absolutely no idea. The form they signed did not say that it was irrevocable. They relied on the advice of their accountants. So it would fold into that, that if this benefits no taxpayers. So assuming that there was no benefit to them, first of all, it was, they signed the 1040. All right. So, and I take Ms. Mancino's point that their tax return was many hundreds of pages and it was complicated. But it was up to them and their accountant to have those conversations. And if they didn't know to ask the question, the accountant who affirmatively put this statement on their return should highlight the important things that she did for them and have that discussion. To follow up on that question. Yes. Even in the Internal Revenue Service, you have to have due process. And due process would seem to me to call for a notice on your form that says this is an irrevocable decision. Well, that is. It doesn't say that, right? It doesn't say that. No, it does not. No, but that is right there in the statute in plain English, fairly simple English, by the standards of the tax code for everyone to see. And we've all read the Internal Revenue Code, haven't we? We do that every year. I'm sorry? I said we all read the Internal Revenue Code. No, we don't. Yes, I agree with you. But the accountant has her CLEs, right? So this is an accounting malpractice action in your mind? For us, that is. And the liable party should really be the accountant's malpractice insurance company, not the government. Isn't this kind of harsh for the taxpayer? I mean, the purpose for the election is to help the taxpayer better utilize a net operating loss. Isn't that the purpose for the election? Just to help the taxpayer? Yes, but that doesn't mean that the taxpayer should always win, right? There are some things that the taxpayer reports on his or her tax return that after an audit or maybe after circumstances have changed, that just didn't work out well. And here, I would argue the statute, by making it clearly irrevocable, has placed that risk on the taxpayer for whatever reason. If there is a breakdown in communication between the taxpayer and the accountant or if their economic situation didn't work out the way that they thought it would, well, then that risk was on the taxpayer, not the government. Did the taxpayer appreciate the risk, which is, I think, going back to what Judge Vinson's question was, that if you know you sign under penalty of perjury, but you also have the ability to do an amended return and you've signed a form that never said it was irrevocable, did the taxpayer have any indication, short of reading the Internal Revenue Code, that this election was being made and could never be taken back? Well, the risk is on the taxpayer and his or her tax advisor and not on the government. And by hiring a tax advisor and choosing their tax advisor, they had to have that conversation. The default, if you don't exercise the election, what is the default? The default is it applies to the past two years or past three years and then applies to the future. To the limit, if you have an operating loss, you can take, what, $3,000 a year against your ordinary income? That's limited, so you're subject to that against an ordinary income? Oh, that's capital gain loss, I'm sorry. Yeah, I don't think that the limit's $3,000. Net operating loss, you can use as much as you want. Right, right. What is the default? Does it go back three years? Correct. Well, in the year it issued, it's changed since 2017. Yes, two years in the year it issued. Yes, two years and then 20 years. Lastly, I just want to make the point that Ms. Mancino made in placing the words, weight on the words, may elect and once made in the statute to add this knowing involuntary requirement to the statute specific to this provision and on top of the sworn statement on the back of their Form 1040. We think that that is putting too much weight on those words, and they've cited no case that supports that reading of the statute or similar language in other tax election statutes, a couple of examples of which they've discussed in their brief. So they are essentially asking for an unprecedented ruling here that is not supported by at least presidents in other circuits and as well as a tax court decision that was affirmed by this court. How often does the IRS see this election, this particular election made? I do not have statistics on that. I mean, is it a rare one? Is it a frequent one? Do you have any idea? I do not have any idea. And in closing, we would ask this court to affirm. Thank you. Thank you, Ms. Long, and we'll hear from Mr. Mancino. Well, let me begin by saying that this is a case of first impression. Unlike all of the decisions that have been decided in the tax court and at the appellate level, this is not a heads-eye-wind-tails-the-IRS-loses. This is a situation where— Well, let me challenge that. You said it's a case of first impression, but the cases are legion where taxpayers have said, well, I didn't know what my tax preparer did that. But to the best of my recollection, Your Honor, all of the cases involve situations where the tax advisor advised and interfaced with their client to make a conscious decision, and then they argued that there was a mistake of fact or law or changed circumstances that occurred after the election was made that made it more advantageous to have not made the election than it was as they thought at the time they made it. This is a situation where there was no consensual act on the part of the taxpayer in the first place. They had no—you know, speaking of the jurat that we were talking about earlier, the fact is it's to the best of their knowledge. You know, and— So if we accept your argument, we would have to write an opinion that would add a knowledge requirement to Section 172b3. And I'm not sure—has anybody ever done that before? We would have to do that in order to accept your argument, right? I don't think so, Your Honor. I think that all you have to do is look at the question of whether— being made by a taxpayer to take advantage of something for which there is no advantage. That's a knowledge requirement, right? It's more of an intent requirement, and it's impossible to form an intent if you don't have any understanding of what the consequences of your action are. Well, tax preparers do this all the time. They prepare a return, say, here's the return. I've used the information you've provided. Here it is, and it's up to the taxpayer to look at it and sign it. Well, Your Honor, I agree with you to the extent that that's the normal situation. I mean, that's— But there are many— Millions of people do that every year. Right, but there are a legion of situations where reasonable reliance on the advice of a tax advisor, for example, is a basis for abating a penalty. Here, there was absolutely no knowledge, no advice, no nothing. The bays wouldn't have been put on notice because, frankly, of a deficiency in the guidance provided by the Internal Revenue Service to know that any election is irrevocable. Well, in this year, it was an obvious decision because you had operating losses in the prior two years, so there would be no reason to try to apply it to prior years, so you would want to definitely carry it forward. I mean, the tax preparer would have made that decision as a matter of logic, right? Actually, no, Your Honor. It was not? Mechanically, the way the net operating loss carryback and carryforward rules work is that even though they did have a $14 million, I believe, net operating loss in 2014, that would have been carried back to 12 and 13. It would not have been absorbed fully, and then it would have been carried forward to 2015 and forward. So mechanically, the way the 172 rules work, the election to waive the two-year carryback was completely unnecessary. But in so doing, the return preparer, without the concurrence or knowledge of the taxpayer, has created an alternative minimum tax windfall to the government. So this is really a matter of getting to the correct tax under the complex circumstances that exist today. In preparation for today, I took a look at the tax service, and there's more than 50 elections that, by their terms, are irrevocable. I, as a tax return professional, probably understand the consequences of a handful of them simply because no single firm or preparer probably has the breadth of expertise to know every provision of the Internal Revenue Code and its consequences. But that's what the code says. It is what the code says, Your Honor. But again, it assumes that there is a decision. If you look at the words of 170, it says may elect. It means that there's a choice to be made there. And in 1976, when that provision was added, there was actually a positive tax benefit. Fast forward to 2014, may elect still reads the same. It still means there's a choice. But there is no tax benefit to be obtained by making that election. But we still have a statute that says irrevocable, and you said that maybe not every tax preparer knows the ins and outs of every irrevocable election. But I feel certain that every tax preparer, if they run across a situation where they're having to have their client make an irrevocable election, that tax preparer would get up to speed on that because surely you would concede that irrevocable election is something not to be taken lightly in any context. Yes, but you asked the question earlier whether this was really a malpractice case. It's really a matter of getting to the correct tax owing by the bays for 2012. And then once that's determined, then we can go back and that will set damages. But no malpractice judge or juror is going to say that, wait, you owe the tax. But the 2012 tax was revised, right? It was recalculated because of an error in the initial return? It was recalculated because of an error in 2013. She overstated by over $4 million the net operating loss in that year. And that's what created the fact that there was no net income against which the net operating loss from 2014 could be offset against. So it was errors compounding errors. But from the standpoint of the bays, they had somebody who they relied on for 30 years. They entrusted her to not just their personal but their business returns. And she, frankly, got out of her league. But that doesn't miss the point that, in fact, they ended up paying an AMT for which they will never recover any benefit. That's several hundred thousand dollars more than the government owes. Thank you for your time. Thank you, counsel.